UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JEFFREY L. FINLEY,<br><br>Plaintiff,<br><br>v.<br><br>RON NEAL, et al.,<br><br>Defendants. | CAUSE NO. 3:24-CV-74-PPS |

OPINION AND ORDER

Jeffrey L. Finley, a prisoner without a lawyer, brings two claims related to a fire that occurred at Indiana State Prison ("ISP") on January 14, 2023. First, he is proceeding against Officer Kevin Cross, Lieutenant Nadine Smith-Robinson, Officer Darnell Crockett, Sergeant Jeniene Walton, Lieutenant Dennis Koen, Case Worker Jacqueline Mayes, and Dr. Christina Chico "in their personal capacity for money damages for denying him medical care for injuries he suffered in a January 2023 fire in violation of the Eighth Amendment[.]" ECF 23 at 11. Second, he is proceeding against Commissioner Christina Reagle, Warden Ron Neal, Assistant Warden Dawn Buss, Major Douglas Wardlow, Supervisor of Fire Training Gordon Beecher, and Safety Hazard Manager Deborah Taylor "in their personal capacity for monetary damages for deliberate indifference to the risk of harm posed by a fire that occurred in January 2023 in violation of the Eighth Amendment[.]" *Id*. For simplicity's sake, I will refer to these defendants collectively as the "state defendants". The state defendants filed a joint motion for summary judgment, which is fully briefed. ECF 125, 126, 128, 134, 138, 139,

151, 158. The remaining defendant, Dr. Chico filed a separate motion for summary judgment, which is likewise fully briefed. ECF 129, 130, 131, 132, 136, 137, 146.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). I will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). My sole task at this stage of the case is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable factfinder could find in favor of the non-moving party, summary judgment may not be granted. *Id.*

I will address the state defendants' summary judgment motion first and then turn to Dr. Chico's summary judgment motion.

**I. State defendants**

Finley is proceeding against the state defendants on two claims. First, he is proceeding against one group of state defendants who were physically present for and actively involved in responding to the January 14 fire – Officer Cross, Lt. Smith-Robinson, Officer Crockett, Sgt. Walton, Lt. Koen, and Case Worker Mayes (collectively, the "incident defendants") – for denying him medical care for injuries he suffered during the January 14 fire. ECF 23 at 11. Second, he is proceeding against another group of state defendants who are supervisory officials at ISP – Commissioner Reagle, Warden Neal, Assistant Warden Buss, Major Wardlow, Supervisor of Fire Training Beecher, and Safety Hazard Manager Taylor (collectively, the "supervisory defendants") – for deliberate indifference to the risk of fire at ISP. Each claim will be addressed in turn.

A. *Incident Defendants*

Finley is proceeding against the incident defendants for denying him medical care for injuries he suffered during the January 14 fire. Viewed in the light most favorable to Finley, the evidence shows the following facts:

During all relevant times, Finley was living in Cell 526, a single-man cell on the fifth floor of the north side of A Cellhouse (ACH). ECF 126-1 at 12. Around 11:00 a.m. on January 14, 2023, a fire started in cell A252, on the north side of ACH. ECF 104-1 at 22. The individual who lived in cell A252 was Michael Smith. *Id.* Finley's cell was three floors above cell A252. ECF 126-1 at 12-13. Once the fire started, Finley screamed at the bars of his cell to draw attention to the fire, and other inmates began banging on the

metal property boxes in their cells to make noise and alert the officers. *Id.* at 16-17, 21, 24.

At around 10:58 a.m., prison staff heard the fire alarm in ACH go off and inmates yelling, prompting them to respond. ECF 126-11 at 2. Sgt. Walton called a 10-71, which is the signal for a fire in ACH. ECF 126-11 at 2; ECF 93 at 5-6. Officer Cross grabbed a fire extinguisher from the officer's station, and he and Officer Crockett went to the 200 North range with the fire extinguisher and the keys to the range. ECF 126-3 at 3; ECF 126-11 at 2. Once they were on the 200 range, they realized the location and size of the fire. *Id.* They proceeded to Cell A252, but it was hard to get near the front of the cell to manually unlock the door because of the intensity of the fire. *Id.* Officer Cross used the fire extinguisher, but it was not able to put out the fire. ECF 126-3 at 3. Officer Cross had unknowingly grabbed a water-based fire extinguisher and realized he needed an ABC fire extinguisher instead. *Id.*

Officer Cross then raced back downstairs and met Lt. Smith-Robinson, who handed him an ABC fire extinguisher. ECF 126-3 at 3; ECF 126-4 at 2. At approximately 10:59 a.m., Officer Cross returned to Cell A252 with the ABC fire extinguisher and passed it to Officer Crockett, who deployed it to control the fire. ECF 126-11 at 2; ECF 126-3 at 3. First responders arrived on the scene, including Lt. Koen. ECF 126-11 at 2; ECF 126-5 at 2. Lt. Koen was able to open the door to Cell A252 as staff continued to try to put out the fire. ECF 126-11 at 2; ECF 126-5 at 2. The inmate firefighters arrived on the scene and were able to extinguish the fire. ECF 126-11 at 3.

While the fire was ongoing, Finley testified he was having difficulty breathing due to the smoke in the cellhouse and that he lost consciousness and blacked out during the incident. ECF 126-1 at 17, 27-29. Finley was lying down when he passed out and did not recall how long he was unconscious. *Id.* at 28-29. He coughed so hard that he vomited and struggled to breathe. *Id.* at 27-28. He also temporarily had blurry vision and had a burning sensation in his nose and sinuses due to the smoke. *Id.* at 29.

Once the inmate firefighters arrived and began extinguishing the fire, Captain McCann authorized the evacuation of the remaining inmates in ACH. ECF 126-4 at 2. Correctional officers unlocked the cells and swept each range. *Id*. Finley's cell was opened, and he was able to go down the stairs to evacuate. ECF 126-1 at 32. Finley and the other inmates were escorted to the recreation building, while any inmate experiencing an apparent medical emergency was taken directly to the medical services unit. ECF 126-5 at 3; ECF 126-6 at 2; ECF 126-1 at 33-34. Finley testified that, during the evacuation, he requested assistance from Lt. Koen and Case Worker Mayes, but both told him to "[g]o to rec." ECF 126-1 at 35. Once they arrived at the recreation area, correctional staff attempted to group the inmates for a count, and Finley again asked Case Worker Mayes for assistance. *Id.* at 35-36. She responded that they were trying to do a count and get the inmates back to their cell houses, and that she would "have somebody get to [him] later." *Id.* at 35-36. Case Worker Mayes is the only incident defendant Finley spoke to while at recreation. *Id.* at 36.

After ACH was cleared, the inmates were returned to their cells and placed on lockdown. ECF 126-3 at 4; ECF 126-4 at 2. Lt. Koen and Lt. Smith-Robinson assisted in directing inmates back to their cells. ECF 126-4 at 2; ECF 126-5 at 3. While Finley was returning to his cell, he told Lt. Koen he needed medical attention, and Lt. Koen responded, "[r]ight now, you got to lock in, get everybody locked in." ECF 126-1 at 38. Finley did not have any other conversation with Lt. Koen, nor did he speak to any other incident defendants prior to locking up. *Id.*

Once inmates were back in their cells, Lt. Smith-Robinson and other custody staff performed a count of the inmates, did rounds in the cellhouse, spoke with the inmates, and informed medical staff if any of them required assistance. ECF 126-4 at 3. Inmates who requested medical attention but showed no signs of a medical emergency would first have been secured in their cells before staff began triage, because any treatment would have required coordination with medical staff. ECF 126-5 at 3.

After Finley was locked in his cell, he testified that he repeatedly sought medical attention but did not receive a response. He first yelled three or four times toward correctional staff working in the unit, which included Officer Cross, Officer Crockett, Lt. Smith-Robinson, and Sgt. Walton. ECF 126-1 at 38-40. He did not, however, see or speak directly with any of those defendants. *Id.* at 40-41. The only incident defendant he recalled seeing after returning to his cell was Lt. Koen, with whom he likewise had no direct interaction. *Id.* Finley also testified that he asked Dr. Chico for a healthcare request form when she passed his cell. *Id.* Dr. Chico told him that she would arrange for someone to return to see him, but no one did. *Id.* Finley thereafter continued yelling

from his cell toward the officer's station in an effort to obtain a healthcare request form but received no response. *Id.* at 42. He did not know who was in the officer's station at that point in time. *Id.* at 42-43. He did not attempt to obtain any healthcare request forms after the day of the fire because he had "lost all faith." *Id.* at 43. He never submitted a healthcare request form relating to his alleged injuries stemming from the incident, and it is unclear from the record whether he ever received any treatment for those alleged injuries. *Id.*

As discussed, Finley is proceeding against the incident defendants "for denying him medical care for injuries he suffered" during the January 14 fire. ECF 23 at 11. The incident defendants argue summary judgment is warranted in their favor on this claim because (1) Finley did not suffer any objectively serious medical condition, (2) they were not deliberately indifferent to that condition, and (3) they are entitled to qualified immunity.

Under the Eighth Amendment, prison officials have a duty to ensure inmates receive constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability for an Eighth Amendment violation, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendants acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the second prong, Finley must show the incident defendants "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d

469, 478 (7th Cir. 2005) (internal quotation marks, brackets, and citations omitted). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)). The deliberate-indifference inquiry is subjective: the defendant must be aware of facts supporting an inference that a substantial risk of serious harm exists and must actually draw that inference. *See Farmer*, 511 U.S. at 837; *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024). Accordingly, for Finley to survive summary judgment, the evidence must permit a reasonable jury to find that each incident defendant knew he faced a serious medical risk and consciously disregarded it.

The evidence does not permit that finding as to Officer Cross, Officer Crockett, Lt. Smith-Robinson, or Sgt. Walton. Finley testified that, after he returned to his cell, he yelled three or four times to correctional staff working in the unit—which, he testified, included these four defendants—that he needed medical assistance. ECF 126-1 at 38-40. But he did not interact directly with any of them; the only incident defendant he recalled seeing after he was locked in his cell was Lt. Koen, and he did not know who was in the officer's station when he later yelled for healthcare request forms. *Id.* at 40-43. His testimony therefore does not establish that any one of these defendants heard his request, knew of his symptoms, or otherwise knew he faced a serious medical risk. Because deliberate indifference requires personal knowledge and conscious disregard, Finley's generalized requests to staff do not support liability against these defendants.

Lt. Koen and Case Worker Mayes responded more directly to Finley's requests, but their responses do not permit a finding of deliberate indifference. During the evacuation, Finley requested assistance from both defendants, and they directed him to proceed to the recreation building. ECF 126-1 at 32-35. This was obviously an emergency situation. There had been a fire in a confined space in a prison. That situation is obviously fraught with peril. The defendants had to move dozens of prisoners to a safe location. When Finley again asked Case Worker Mayes for assistance in the recreation building, it's clear that Mayes had a lot of balls in the air at that moment. So, it was entirely reasonable for her to explain to Finley that staff were conducting a count and trying to return the inmates to their cells, and that someone would assist him later. *Id.* at 35-36. As Finley was returning to his cell, Lt. Koen likewise told him that the immediate priority was to get everyone secured in their cells. *Id.* at 38. In this context, these responses deferred Finley's request while staff completed the evacuation, count, and securing of the inmates; they did not foreclose treatment.

More generally, the Eighth Amendment did not require the incident defendants to abandon their responsibilities during the fire response to personally secure immediate medical treatment each time Finley requested assistance. Staff had a procedure under which inmates experiencing a medical emergency were taken directly to the medical unit, while other inmates requesting care were first secured in their cells and then triaged so treatment could be coordinated with medical staff. ECF 126-5 at 3; ECF 126-6 at 2. Finley was able to walk down the stairs and proceed with the other inmates to the recreation building, and there is no evidence that he appeared to require

emergency intervention. ECF 126-1 at 32-38. The incident defendants did not act with deliberate indifference by continuing the evacuation, count, and securing of ACH and directing Finley through the procedure established to address non-emergency medical requests. *See Hayes v. Zatecky*, No. 1:21-CV-00630-JPH-KMB, 2023 WL 5722673, at *5 (S.D. Ind. Sept. 5, 2023) (administrators were not required to personally secure treatment for non-emergency complaints where the inmate could seek treatment through appropriate medical channels) (*citing Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)); *Robertson v. Liedtke*, No. 3:23-CV-514-HAB, 2026 WL 274603, at *4-5 (N.D. Ind. Feb. 2, 2026).

Finley's later failure to receive medical treatment does not show that any incident defendant deliberately blocked his access to care. Once he was back in his cell, Finley did not interact directly with any incident defendant, and Dr. Chico later came by as part of the post-fire triage process. ECF 126-1 at 38-42. The fact that no one ultimately returned to take Finley to the medical unit could show that a breakdown occurred somewhere in that process, but it does not identify any incident defendant as responsible for the breakdown or permit a reasonable inference that the failure resulted from deliberate indifference. *See Barghouti v. Hansen*, No. 24-2610, 2026 WL 2169044, at *3 (7th Cir. July 28, 2026) (a subsequent delay in treatment did not establish who was responsible for the breakdown or that it resulted from deliberate indifference).

Lastly, to the extent Finley's claim rests on a delay or failure to obtain treatment, he also has not produced medical evidence bolstering his argument that the lack of earlier care caused him additional harm. *See Barnes v. Wexford Health Sources, Inc.*, 177

F.4th 825, 833 (7th Cir. 2026) (when a plaintiff alleges delayed treatment, he must present verifying medical evidence that the delay, rather than the underlying condition, caused harm). It is unclear whether Finley ever received treatment for symptoms related to the fire at all, much less medical evidence that earlier evaluation would have prevented additional injury or otherwise changed his medical outcome. *See Barnes*, 177 F.4th at 833; *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009).

Accordingly, even crediting Finley's testimony that he repeatedly requested medical attention, the evidence simply does not permit a reasonable jury to find that any incident defendant consciously disregarded a known, serious medical risk. Summary judgment is therefore warranted in favor of the incident defendants on this claim.[1]

B. *Supervisory Defendants*

Finley is proceeding against the supervisory defendants on a deliberate-indifference claim based on the risk of harm posed by the January 2023 fire. There is no evidence that any of these defendants were present for or personally involved in responding to the January 14 fire. Rather, Finley's claim concerns their conduct before the fire: he contends that they knew conditions in ACH created a substantial risk of serious harm in the event of a fire but failed to take reasonable measures to address that risk.

[1] Because the record does not permit a reasonable jury to find the incident defendants liable for deliberate indifference, I do not reach their alternative arguments that Finley did not have an objectively serious medical need or that they are entitled to qualified immunity.

The supervisory defendants submit affidavits from ISP Safety Hazard Manager Taylor and Warden Neal describing the fire-prevention and response measures in place at ISP at the time of the January 14 fire. They attest to the following facts:

ISP maintains its own on-site inmate fire department, whose members receive statewide firefighter certification and training through the State Fire Marshal, allowing the facility to respond to fires more quickly than if it had to wait for an outside fire department. ECF 126-7 at 2. ISP also equips its fire department with the latest firefighting and smoke-control equipment, including foam backpack fire-suppression systems and smoke-evacuation systems. *Id.* All fire alarms were operational at the time of the January 14 fire, several had been newly installed or refurbished, and the dampers and exhaust systems in the cellhouses were regularly repaired and replaced as needed to ensure they remained operational. *Id.*

ISP had also implemented additional fire-safety measures following a 2017 fire. It purchased additional water and ABC fire extinguishers, which were placed at officers' stations and on the endcaps of each cell range; reduced the amount of property inmates could keep in their cells; and replaced plastic property boxes with more fire-resistant steel boxes. ECF 126-7 at 2-3. The housing units themselves are primarily constructed of steel and concrete, and ISP uses fire-retardant mattresses. *Id.* at 4. In 2019, ISP also upgraded all of its fire hydrants. *Id.*

These measures were supplemented by regular inspection, training, and emergency-planning procedures. The ISP Fire Department conducted bimonthly inspections of all fire extinguishers, and there were no reports of inoperable or empty

extinguishers in ACH leading up to the January 14 fire. ECF 126-7 at 4; ECF 126-8 at 2. The Safety Hazard Manager and ISP Fire Department also conducted four fire drills per year for each building. *Id.* Finally, ISP maintained a Fire Plan setting out staff procedures for fire prevention and evacuation, and all staff received training on the plan and were required to complete a questionnaire testing their knowledge of those procedures. ECF 126-7 at 4-5; ECF 126-8 at 2.

All supervisory defendants attest they were unaware of any infrastructural issues or conditions at ISP that created a fire risk or threatened the lives of inmates living in ACH. ECF 126-2 at 1; ECF 126-7 at 6; ECF 126-8 at 4; ECF 126-9 at 3; ECF 126-10 at 2. The January 14 fire was investigated by both the State Fire Marshal and ISP's Internal Affairs Division, and neither party was able to determine the cause of the fire. ECF 126-7 at 7.

In his response, Finley lists twenty-five conditions he contends made ACH unsafe and created a substantial risk of harm in the event of a fire: (1) no inmate firefighters were housed in ACH; (2) fire signals were not called promptly; (3) staff did not promptly release inmate firefighters to respond to fires; (4) electrical outlets were not grounded; (5) the smoke-ventilation exhaust system was inoperable; (6) fire extinguishers were either inoperable or insufficient in number; (7) staff were inadequately trained; (8) automatic smoke alarms were inoperable; (9) the paint was flammable; (10) staff training was deficient; (11) cells lacked emergency call buttons; (12) staff did not perform timely security checks; (13) cells had double-locking manual doors; (14) most fire extinguishers were water-based rather than ABC extinguishers;

(15) staff cheated on fire-preparation questionnaires; (16) staff conducted sham fire drills; (17) there was no automated fire-suppression system; (18) the smoke-ventilation exhaust systems were not operational; (19) smoke detectors were positioned too high; (20) there were widespread problems with electrical outlets; (21) too few fire drills were conducted; (22) inmates were not provided storage containers with lids or covers; (23) staff failed to comply with recommendations made after the 2017 fire; (24) fire-safety equipment was not meaningfully inspected; and (25) staff were not properly questioned regarding their knowledge of fire-safety procedures. ECF 140-1 at 22-23.

In support of these arguments, Finley states that he "has provided a panoply of evidence," yet only has citations for four of the listed conditions. *Id.* And those sparse citations are largely lacking or even contradict his assertions. For example, for his contention that there was no operational smoke ventilation exhaust system, he cites *Jenkins v. Bass*, 2025 WL 1916106 (N.D. Ind. July 10, 2025), *reconsideration denied*, 2025 WL 2982380 (N.D. Ind. Oct. 23, 2025). He states that *Jenkins*, which was also about a fire in the prison, made the supervisory defendants aware that the exhaust system was inoperable. ECF 145-1, 23. But that is not what *Jenkins* stated. *Jenkins,* 2025 WL 1916106 at *4. Much the opposite, the opinion granting summary judgment stated that the smoke was cleared "*using exhaust fans* and other fans brought to the unit." *Id.* at *2. At the summary judgment stage, I may disregard unsupported factual contentions and need not scour the record for any possible evidence that might be relevant to the plaintiff's contentions here. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017)

(holding that a court need not "scour the record in search of evidence to defeat a motion for summary judgment.").

Regardless, the question is not whether ISP could have done more; it is whether the supervisory defendants were deliberately indifferent to a substantial risk of serious harm. Deliberate indifference requires more than negligence or even objective recklessness. *Stockton*, 44 F.4th at 615. An official who takes reasonable measures to address a known risk is not deliberately indifferent merely because additional precautions were available or the measures taken ultimately proved insufficient. *See Farmer*, 511 U.S. at 844 (an official who responds reasonably to a known substantial risk cannot be held liable under the Eighth Amendment even if the harm is not ultimately averted); *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (an official is not liable where the measures taken were "reasonably calculated" to address the risk, even though they ultimately failed to prevent the injury); *Bagola v. Kindt*, 131 F.3d 632, 647-48 (7th Cir. 1997) (officials who took reasonable steps to prevent harm were not deliberately indifferent even though they may have acted negligently or failed to eliminate the risk as quickly as possible). Thus, Finley cannot establish deliberate indifference simply by identifying additional fire-safety measures that ISP could have implemented.

Here, the undisputed evidence shows that the supervisory defendants took numerous steps "reasonably calculated" to address the risk posed by a fire. *See id.* Before the January 14 fire, ISP had: (1) established an on-site inmate fire department whose members received statewide firefighter certification; (2) repaired and replaced

dampers, exhaust systems, fire alarms, and fire extinguishers as needed; (3) purchased updated firefighting equipment, including foam backpack fire-suppression systems and smoke-evacuation systems; (4) purchased additional water and ABC fire extinguishers; (5) reduced the amount of property inmates could keep in their cells; (6) replaced plastic property boxes with more fire-resistant steel boxes; (7) upgraded its fire hydrants; (8) regularly inspected its fire extinguishers; (9) conducted fire drills four times per year; (10) implemented a Fire Plan governing fire prevention and evacuation; and (11) trained and tested staff on that plan.

Finley lists various ways in which he believes these precautions were inadequate or could have been implemented more effectively. But, as I noted above, the Eighth Amendment did not require the supervisory defendants to eliminate every conceivable fire hazard or adopt every additional precaution that might have reduced the risk further. The undisputed evidence instead shows a substantial system of fire prevention, firefighting, evacuation, inspection, and training measures directed at the very risk Finley contends the defendants ignored. That those measures did not prevent his exposure to smoke during the January 14 fire does not permit a reasonable jury to conclude that the supervisory defendants exhibited "a total unconcern" for his safety. Summary judgment is therefore warranted in favor of the supervisory defendants on this claim.

Accordingly, for these reasons, summary judgment is warranted in favor of all state defendants on both of Finley's claims.

**C. Dr. Chico**

Finley is proceeding against Dr. Chico on an Eighth Amendment claim that she was deliberately indifferent to his need for medical care following the January 14 fire. ECF 23 at 11. Dr. Chico moves for summary judgment, arguing that the evidence does not permit a reasonable jury to find that she was deliberately indifferent to any serious medical need. ECF 129; ECF 132.

Dr. Chico provides an affidavit in which she attests to the following facts: During all relevant times, Dr. Chico worked at ISP as a psychologist providing mental health services to inmates. ECF 130-1 at 1. She was not scheduled to work on January 14, 2023, but was called after the fire in ACH and asked to come to the prison to check on the inmates' mental health. *Id.* at 2. By the time she arrived, the fire had been extinguished. *Id.* Dr. Chico spent the next four or five hours walking each range of ACH and checking on each inmate, including Finley. *Id.* She reminded inmates that she was available for mental health counseling, and several inmates who requested follow-up mental health treatment were scheduled for appointments. *Id.*

Because Dr. Chico is a psychologist rather than a medical doctor, she did not evaluate inmates for specific medical treatment during these rounds. ECF 130-1 at 2. If an inmate requested medical care, however, Dr. Chico attests that she recorded the inmate's cell location on a list and provided the list to custody staff so the inmate could be taken to the medical unit. *Id.* at 2-3. She did not have authority to personally escort inmates to the medical unit. *Id.* at 3. Dr. Chico does not specifically recall whether Finley requested medical care when she spoke with him, but she attests that, if he did, she

would have included his cell location on the list provided to custody staff. *Id.* She further attests that she observed no inmate displaying obvious signs of a medical emergency and believed that inmates who requested treatment would be taken to the medical unit. *Id.* After completing her rounds and providing her list of cell locations to custody staff, Dr. Chico left the prison. *Id.*

In his response, Finley states that, when Dr. Chico came by his cell, he informed her of his symptoms and requested medical care, and she responded that she was a mental health professional and was not responsible for his healthcare. ECF 136-1 at 3. He asserts he was not taken to the medical unit despite reporting these symptoms and argues Dr. Chico was therefore deliberately indifferent for several reasons.

Finley first argues that Dr. Chico acted with deliberate indifference by providing the list of inmates requesting medical attention to custody staff rather than directly to medical staff. ECF 136-1 at 9. That conduct does not permit a reasonable inference of deliberate indifference. Dr. Chico attests that she provided the list to custody staff so that those inmates could be taken to the medical unit for evaluation. Even if Finley believes it would have been preferable for Dr. Chico to communicate directly with medical staff, the Eighth Amendment did not require her to personally undertake every step necessary to secure treatment where she reasonably referred the matter to other prison employees responsible for arranging access to the medical unit. *See Burks*, 555 F.3d at 595 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). Providing Finley's request for medical attention to

custody staff so that they could arrange for him to be seen by medical personnel therefore does not exhibit "a total unconcern" for his welfare.

Next, Finley argues that Dr. Chico "failed to notify medical staff (or any other staff for that matter) of my need for medical attention, and instead rushed back home to continue enjoying her day off and entertaining her house guests." ECF 136-1 at 3. Dr. Chico, however, attests that "[a]ll offender requests for medical treatment that were made to me were recorded and delivered to custody staff." ECF 130-1 at 3. Finley has no personal knowledge of what Dr. Chico did after leaving his cell and therefore cannot contradict her testimony based on his own observations. He nevertheless argues that the circumstantial evidence creates a genuine dispute as to whether Dr. Chico actually provided the list of inmates requesting medical attention to custody staff. ECF 136-1 at 10-11. He relies on two grounds.

First, Finley argues that the incident defendants' attestations that they were unaware of his request for medical attention create a factual dispute as to whether Dr. Chico ever provided the list of cell locations to custody staff. ECF 136-1 at 10. But Dr. Chico does not identify which member of custody staff received the list, and there is no evidence that she provided, or was expected to provide, the list to any of the incident defendants specifically. The fact that those defendants were unaware of Finley's request therefore does not contradict Dr. Chico's testimony that she provided the list to custody staff; she could have provided it to another custody employee who is not a defendant in this case.

Second, Finley argues that the fact that custody staff did not ultimately send him for medical treatment creates a genuine dispute as to whether Dr. Chico actually provided the list of cell locations to custody staff. Similar arguments were recently addressed by the Seventh Circuit in *Taylor v. Reagle*, No. 25-2338, 2026 WL 1951623 (7th Cir. July 6, 2026), and *Barghouti v. Hansen*, No. 24-2610, 2026 WL 2169044 (7th Cir. July 28, 2026). Although both are nonprecedential dispositions, they are persuasive because they address similar attempts to infer from a plaintiff's subsequent failure to receive treatment that a defendant never relayed his request for medical assistance.

In *Taylor*, the district court determined that defendant Sergeant Williams was not deliberately indifferent to Taylor's serious medical need after crediting Sgt. Williams's testimony that he telephoned medical staff and relayed Taylor's complaints. On appeal, Taylor argued that Sgt. Williams's testimony was contradicted by Taylor's own sworn statements and the absence of an entry documenting the call in the relevant logbook. The Seventh Circuit affirmed, concluding that "neither Taylor's statements nor the lack of entry in the logbook create a genuine dispute of fact." *Id.* at *2. Because Taylor lacked personal knowledge of whether Sgt. Williams contacted medical staff, he could not genuinely dispute Sgt. Williams's sworn testimony that he had done so. *Id.* (citing *Payne*, 337 F.3d at 772). Nor did the absence of a logbook entry, "without more," permit a reasonable inference that the call never occurred. *Id.* (*citing Estate of Biegert ex rel. Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020)).

Similarly, in *Barghouti*, the plaintiff argued that correctional officers had lied when they testified that they contacted medical staff about his complaints. 2026 WL

2169044, at *3. The Seventh Circuit rejected that argument because there was no record evidence contradicting the officers' accounts, explaining that "[m]ere speculation cannot defeat a motion for summary judgment." *Id.* Although the court expressed concern that Barghouti had waited as long as a day and a half for medical attention, that delay did not establish that the officers had failed to contact medical staff because "the record does not indicate why the delay occurred or who was responsible, much less whether the delay was the result of deliberate indifference." *Id.*; *see also Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("[T]he plaintiff must show that the defendant's actions or inaction caused the delay in his treatment.").

The same reasoning applies here. Finley has no personal knowledge of what Dr. Chico did after leaving his cell and relies on the fact that he was not subsequently taken to the medical unit to infer that she must not have delivered the list to custody staff. But the fact that Finley ultimately did not receive medical attention on the day of the fire does not reveal where the process broke down, much less permit a reasonable jury to attribute that failure to Dr. Chico. *See Barghouti*, 2026 WL 2169044, at *3; *Walker*, 940 F.3d at 964. There is no evidence contradicting Dr. Chico's sworn testimony that she recorded all requests for medical treatment and delivered them to custody staff. On this record, concluding that she failed to do so merely because Finley was not ultimately taken to the medical unit would rest on speculation rather than a reasonable inference from the evidence. *See Taylor*, 2026 WL 1951623, at *2; *Biegert*, 968 F.3d at 701; *Payne*, 337 F.3d at 772.

Moreover, even if a reasonable jury could infer that Dr. Chico failed to include Finley's cell location on the list, there is no evidence that any such omission amounted to deliberate indifference rather than negligence. Nothing in the record suggests that Dr. Chico intentionally withheld Finley's request, deliberately omitted him from the list, or otherwise consciously chose to prevent him from receiving medical care. Thus, even assuming some breakdown attributable to Dr. Chico occurred, the record would permit only speculation as to whether it was inadvertent or reflected the culpable state of mind required for an Eighth Amendment violation. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc); *Farmer*, 511 U.S. at 836-38.

Third, the lack of evidence that any delay harmed Finley provides an additional reason his claim cannot proceed. When a claim rests on delayed rather than denied treatment, the plaintiff must present verifying medical evidence that the delay itself caused additional harm. *See Barnes*, 177 F.4th at 833. Finley has produced no medical evidence that earlier evaluation would have alleviated his symptoms sooner, prevented additional injury, or otherwise changed his medical outcome. *See Barnes*, 177 F.4th at 833; *Knight*, 590 F.3d at 466.

Accordingly, even accepting Finley's testimony that he asked Dr. Chico to arrange medical attention, there is no nonspeculative evidence that she consciously disregarded that need or caused a harmful delay in treatment. The only competent evidence addressing what she did after speaking with the inmates shows that she recorded requests for medical care and provided the resulting list to custody staff, and Finley has produced no evidence from which a reasonable jury could find either that

she failed to do so in his case or, even if she did, that the omission was anything more than negligent. Summary judgment is therefore warranted in Dr. Chico's favor.

For these reasons, the court:

(1) GRANTS the state defendants' motion for summary judgment (ECF 125);

(2) GRANTS Dr. Chico's motion for summary judgment (ECF 129); and

(3) DIRECTS the clerk to enter judgment in favor of the defendants and against Jeffrey L. Finley, and to close this case.

**SO ORDERED**.

ENTERED: September 22, 2026.

/s/Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT